IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 4, 2011

**STATE OF TENNESSEE v. NATHANIEL P. CARSON**

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2009-A-260     Seth Norman, Judge**

_____

**No. M2010-02419-CCA-R3-CD - Filed April 27, 2012**

_____

A Davidson County Criminal Court jury convicted the appellant, Nathaniel P. Carson, of two counts of first degree felony murder and two counts of especially aggravated robbery. After a sentencing hearing, the trial court sentenced him to concurrent sentences of life for the murder convictions and fifteen years for the especially aggravated robbery convictions. On appeal, the appellant contends that (1) the evidence is insufficient to support the convictions, (2) the trial court allowed improper evidence under Rule 404(b), Tennessee Rules of Evidence, and (3) the trial court should have granted his motion to suppress telephone records. Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

Dwight E. Scott, Nashville, Tennessee, for appellant, Nathaniel P. Carson.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Rob McGuire and Sarah Davis, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

The record reflects that in January 2009, the Davidson County Grand Jury indicted the appellant, along with co-defendants George Cody, Lavonta Churchwell, Gennyfer

Hutcheson, Michael Holloway, and Thomas Reed, for two counts of first degree premeditated murder, two counts of first degree felony murder, two counts of especially aggravated robbery, two counts of identity theft, three counts of forgery, and two counts of attempted forgery. On February 6, 2009, the indictment was amended to charge the appellant with two counts of felony murder and two counts of especially aggravated robbery. The appellant was tried separately from his co-defendants.

At trial, Hans Peter Colas testified that he was a native of Germany but currently lived in Mexico City. The victims, Pierre and Marie Colas, were his children.[1] At the time of their deaths, Pierre was thirty-two years old and an assistant professor in Vanderbilt University's Department of Anthropology. Marie was twenty-seven years old and worked in Zurich, Switzerland. In August 2008, Marie traveled to Nashville to visit Pierre for one week.

Sergio Romero testified that he was a professor in Vanderbilt University's Department of Anthropology and Pierre's very close friend. In the summer of 2007, Pierre bought and moved into a home on McFerrin Avenue in East Nashville. The house had a downstairs living area and an upstairs attic. Pierre did not hang any curtains or blinds on the home's windows so people could see he had nothing of value in the house. He also left the doors of the house open frequently because he preferred the breeze over air conditioning.

Dr. Romero testified that shortly before the victims were shot and killed, he began renting and living in Pierre's attic. About one week before the shootings, Dr. Romero went downstairs about 1:30 a.m. to get some water and saw two men standing outside the kitchen door, looking into the house. He said that he called out to them and that they told him to "shut up." The men drove away in a car that was parked across the street from the house. Dr. Romero had never seen the men before that night and never saw them again. About 7:00 p.m. on August 26, 2008, Dr. Romero attended a faculty meeting. Pierre took Marie shopping and did not attend the meeting. About 9:00 p.m., Dr. Romero went home. Pierre was working in his office, and Marie showed Dr. Romero a pair of boots she had purchased. Dr. Romero got some yogurt from the kitchen and went upstairs. The stairway to the attic was separated from the main floor of the house by a door, and Dr. Romero closed the door so Pierre and Marie could have some privacy. The attic was very hot, and Dr. Romero had a large, noisy fan turned on. He said he began watching television and "couldn't really hear what was going on downstairs." However, he noticed some muffled steps and voices. Dr. Romero knew Pierre was walking because Pierre did not have much coordination on his right side due to some brain damage at birth. Dr. Romero heard other voices and assumed Marie was talking. He said that he heard Pierre scream, "Marie"; that he heard a gunshot; and that he heard Marie say, "[P]lease."

---

[1]Because the victims share a surname, we will refer to them by their first names for clarity.

Dr. Romero testified that he knew something was wrong, was scared, and went downstairs to check the door to the attic. The door was closed, so Dr. Romero went back upstairs and telephoned 911. He said that at some point after the gunshot, he heard the home's security system "chime," meaning the front or back door had been opened or closed. The police arrived at the house, found Dr. Romero upstairs, and handcuffed him. The police took him downstairs, and he saw Marie on the floor. He said she was alive but "on the verge of death." She was lying on her side, and Dr. Romero saw a lot of blood on her side and on the wall. He said he did not remember seeing Pierre. Dr. Romero said that although both of the victims had been fully clothed when he went upstairs, Marie was naked except for a pair of underpants. Her eyes were open, and she was making a wailing sound.

On cross-examination, Dr. Romero testified that he did not know if the security chime was for the front or back door opening. Pierre normally left the front door open and sometimes left the back door open. Dr. Romero did not know how many people were downstairs while he was upstairs.

Officer Shane Fairbanks of the Metropolitan Nashville Police Department (MNPD) testified that about 9:15 p.m. on August 26, 2008, he responded to a shooting/robbery call on McFerrin Avenue and was one of the first officers to arrive. A window on the front of the house and a window on the side of the house were open. Officer Fairbanks and other officers went onto the front porch, announced themselves, and entered the home. The house was not in disarray. They walked through the living room and found the victims on the floor. Both of the victims had been shot, and Marie was moving and moaning. Officer Fairbanks said that Marie was trying to get up and that he told her to try to be still. Then the officers went upstairs and found Dr. Romero, sitting on the floor and talking on the telephone. The officers took him into custody, cleared the house, and allowed paramedics to come in. Pierre was partially sitting up with his back against a wall, and Marie was lying across his legs. Officer Fairbanks said that Pierre's head turned but that "I don't think it was voluntary." The officer noticed that some blood came out of Pierre's mouth. Pierre was wearing shorts, and Marie was wearing panties. Officer Fairbanks said that both of the victims appeared to have head injuries but that "[t]here was so much blood in that small area on both of them, it was hard to tell." Paramedics transported Marie to the hospital.

Officer Charles Linville of the MNPD testified that he arrived at the scene about 10:20 p.m. Blood was immediately inside the front door, and Pierre was lying on the floor in the hallway. Officer Linville saw clothing, a leather satchel, and some pieces of broken black plastic on the floor. He said that a "projectile strike" appeared to be in one of the door facings, that a projectile fragment was on the bathroom floor, and that a spent .380 shell casing was on the floor near Pierre. A pair of latex gloves was hanging on a cart in the kitchen. Officer Linville processed the house for fingerprints but the only sufficient prints recovered belonged to the victims and Dr. Romero.

On cross-examination, Officer Linville testified that blood smears were on the wall in the hallway. He did not see any bloody footprints on the floor, and a fight did not appear to have occurred in the home.

Special Agent Chad Johnson of the Tennessee Bureau of Investigation (TBI) testified as an expert in serology and DNA analysis that he received the evidence collected from the crime scene and saliva swabs collected from the defendants. Agent Johnson tested a pair of latex gloves. He found a mixture of genetic material on the outside of the first glove. Pierre Colas was one contributor to the mixture, and an unknown person was the other contributor. Agent Johnson also found a mixture of genetic material inside the first glove. Co-defendant Cody was a major contributor of the material, and the same unknown person was a minor contributor. On the outside of the second glove, Agent Johnson found a mixture of Pierre's DNA and at least two unknown individuals. Inside the second glove, Agent Johnson found a partial genetic profile that was consistent with the genetic profile of the unknown contributor on the first glove. Agent Johnson said that wearing gloves would have prevented a person from leaving "touch DNA" at the crime scene. He fitted the broken pieces of black plastic back together but could not identify the plastic item. A bloodstain was on the plastic, and the blood belonged to Marie. Agent Johnson also received a .380 semiautomatic pistol. He said that he developed a "very partial profile" for the genetic material on the gun and that the profile was consistent with Cody. In the African-American population, the genetic profile would have been found in one out of every 2,600 individuals.

On cross-examination, Agent Johnson acknowledged that the appellant's DNA profile was compared to all of the unknown DNA profiles generated in this case. He also acknowledged that the appellant was excluded as a contributor on every piece of evidence he tested.

Thomas Reed, Jr., testified that in August 2008, he lived in California but was selling magazines subscriptions door-to-door in Nashville for Titan Sales. Reed was working with a group of about twenty other people, including Michael "Shane" Holloway, and the group was staying at the La Quinta Inn. Reed met Cody at the hotel, and Reed and Holloway began buying drugs from Cody. On August 26, Reed worked all day selling magazine subscriptions. About 10:00 p.m., he arrived back at the La Quinta Inn and attended a one-hour sales meeting. After the meeting, Cody called Reed's cellular telephone. Reed gave the telephone to Holloway, and Holloway spoke with Cody. After the call, Holloway told Reed that they were going to use some credit cards. Sometime after 11:00 p.m., Cody and the appellant picked up Reed and Holloway in a brown car. Cody was driving, Holloway sat in the front passenger seat, and Reed and the appellant sat in the backseat. Reed said that the appellant "didn't say more than what's up or anything" and that "[w]e didn't talk at all."

Cody drove to his house, and Cody's girlfriend, Gennyfer Hutcheson,[2] was there. Reed and Holloway went inside while the appellant and Cody went onto the front porch for five or ten minutes. Reed could not hear what they were saying. Then the appellant left. Reed said that the appellant never said anything about the victims' credit cards and that he thought the appellant "was a friend of Cody's and . . .was just hanging out. That was it."

Reed testified that Cody gave him Pierre's identification and credit cards because "[Cody] thought I looked enough like [Pierre] that I might be able to get away with using them." Cody drove Reed and Holloway to Walmart. Reed and Holloway walked into Walmart, and Cody walked in behind them. Reed bought some clothes for himself and a PlayStation 3. Then the three of them drove to a gas station. Reed said that he tried to use the cards to buy cigarettes and "other stuff" but that the clerk "saw that it wasn't me and would not let me buy any of that stuff." Cody, Reed, and Holloway went back to Cody's house, and Cody and Holloway left to trade the PlayStation for crack cocaine. When Cody and Holloway returned shortly after 3:20 a.m. on August 27, they smoked the cocaine with Reed and Hutcheson. About 5:00 a.m., Cody and Holloway dropped off Reed at the La Quinta Inn. Holloway returned to the hotel about 8:00 a.m. A couple of days later, the police arrested Reed at the hotel. Reed said that he knew the credit cards were stolen but that he did not know anyone had been murdered.

On cross-examination, Reed acknowledged that he was a thief and a drug addict and that he had never previously identified the appellant as the man with Cody on August 26. He also acknowledged that he was "high" when he got into the brown car and that he had been using Fentanyl, a prescription drug, all day. He acknowledged that the appellant did not participate in the credit card scheme. Reed denied that he and Holloway bragged about "jack[ing] and robb[ing] somebody" to get the credit cards.

Officer Ben Ward of the MNPD testified that he investigated the use of the victims' credit cards and went to the Walmart on Gallatin Road. Officer Ward viewed surveillance video of individuals buying a PlayStation 3 with Pierre's credit card at 12:27 a.m. on August 27. They also used the card at Walmart at 12:45 a.m. Surveillance video from the Walgreens on Gallatin Road showed that two men attempted to use the credit card again at 12:56 a.m. The State played the surveillance videos for the jury. Officer Ward said that from the videos, the police identified and arrested suspects. Officer Ward interviewed Reed, who described a man in Cody's car, and the appellant was developed as a suspect. On September 2, 2008, Officer Ward read Miranda warnings to the appellant and interviewed him. During the interview, Officer Ward lied to the appellant by telling him that video evidence showed him in Cody's car. The appellant got very upset and ended the interview.

_____

[2]In the trial transcript, Hutcheson's name appears as Jennifer Hutchison. However, we will refer to her as her name appears in the indictment.

-5-

On cross-examination, Officer Ward acknowledged that the appellant accused him of lying during the interview. The appellant claimed he was at his girlfriend's house on the morning of August 27, and the surveillance videos did not show the appellant using Pierre's credit cards. Officer Ward acknowledged that the appellant voluntarily came to the police department for the interview.

The State played the appellant's videotaped interview for the jury. During the interview, the appellant said that about 5:00 a.m. on August 27, 2008, Cody came to the appellant's girlfriend's house, tapped on the window, and tried to get the appellant to go to Walmart to use some credit cards. Cody did not tell the appellant who owned the credit cards, and the appellant did not ask Cody. Two white males were in Cody's car, and one of them was sitting in the front passenger seat. Cody stayed at the appellant's house for about ten minutes. The appellant refused to help Cody, so Cody and the two white males left. The appellant said that, prior to that incident, he had not seen or talked with Cody for about one week. The appellant claimed that after he helped his girlfriend with her paper route on August 29, 2008, he walked to a gas station to get a drink. He saw police cars and walked to Cody's house to see what was happening. During the interview, Officer Ward told the appellant that he had video evidence of the appellant in Cody's car. The appellant said, "You are a liar." The appellant accused the officer of trying to trick him and stopped the interview.

Officer Kenneth Bray of the MNPD testified that on the night of August 28, 2008, he received information during roll call about possible suspects in the Colas case. He also viewed photographs of the suspects. The mission for the night was to find the suspects and the car they were driving. About 3:30 a.m. on August 29, Officer Bray found a car that matched a description of the suspects' car. The car was parked in the driveway of a home. He said that he "ran the tag" but that the car turned out to be registered to an older white male when the suspect driver was supposed to be an African-American male. While Officer Bray was stopped by the car and filling out paperwork, Cody came out of the house and approached Officer Bray's patrol car. Officer Bray noticed that Cody looked like one of the suspects in the photographs. Another officer arrived at the scene and obtained Cody's identification. Cody went back into the house.

Officer Bray testified that he and the other officer tried to get a detective to come to the scene. No detectives were available, so the officers decided to detain Cody. They went onto the front porch of the house. When Gennyfer Hutcheson opened the door, Officer Bray saw two white males lying on couches, pretending to be asleep. One of the males, Michael Holloway, matched the description of one of the suspects. The other male was Joshua Stafford. The car turned out to be owned by Hutcheson's father. On cross-examination, Officer Bray acknowledged that the appellant was not in the house.

Sergeant Mickey Yentes of the MNPD testified that he went to Cody's home in the early morning hours of August 29. The police already had arrested Cody. While Sergeant Yentes was sitting in his patrol car, he looked in his rearview mirror and noticed a man approaching him. Sergeant Yentes got out of his car and asked the man what he was doing there. Sergeant Yentes said the man claimed he was "just curious and wanted to know what was going on." Sergeant Yentes asked if the man knew why the police were there, and the man said no. Sergeant Yentes identified the appellant in court as the man he saw on August 29.

Sergeant Yentes testified that when the appellant approached his patrol car, the appellant was "constantly looking around, trying to inch closer to the . . . scene, obviously, interested in what was going on." Later that day, Sergeant Yentes helped search Cody's house pursuant to a search warrant. He found the victims' identification cards, social security cards, and credit cards. Another officer found a .380 pistol in a sock. The sock was in a shoe, and the shoe was on the back porch. The police also found a revolver in the home.

On cross-examination, Sergeant Yentes testified that he did not remember the appellant's telling him that the appellant was going to the store to get a drink. Sergeant Yentes did not see a white female with the appellant. He acknowledged that the police found the murder weapon in one of Cody's shoes and found the victims' credit and identification cards in Cody's bedroom. Sergeant Yentes did not find any of the appellant's property in Cody's house.

Detective Matthew Filter of the MNPD testified that he was the lead detective in the Colas case and responded to the crime scene on August 26. Pierre was there but was deceased. Detective Filter also responded to Cody's home on West Sharp Avenue on August 29. Detective Filter determined that Reed and Holloway were in an employee meeting at the time of the shootings and that Joshua Stafford, found with Holloway in Cody's home, did not participate in the shootings. The appellant lived on Carter Street, one mile or less from Pierre's home on McFerrin Avenue and less than one block from Cody's house on West Sharp Avenue. The police developed the appellant, known as "Man Man," and Lavonta Churchwell,[3] known as "Slash," as suspects. On July 7, 2009, Detective Filter interviewed Maurice Boyd, who was incarcerated, about this case. Detective Filter also obtained the cellular telephone records of the appellant, Cody, and Churchwell for August 25, 2008, to September 1, 2008.

The State introduced the telephone records into evidence, and Detective Filter testified about telephone calls made between Cody and the appellant. On the day before the

_____

[3]In the trial transcript, Churchwell's first name appears as Labonte. However, we will refer to him as his name appears in the indictment.

shootings, August 25, 2008, Cody and the appellant made several telephone calls to each other. On August 26, 2008, Cody telephoned the appellant at 8:34 a.m. and 5:04 p.m. The appellant telephoned Cody at 9:56 a.m., 11:26 a.m., 11:44 a.m., 12:22 p.m., 12:43 p.m., 1:12 p.m., 2:26 p.m., and 8:29 p.m. The shootings occurred about 9:10 or 9:15 p.m. The appellant telephoned Cody at 9:39 p.m., 10:48 p.m., and 11:05 p.m., and Cody telephoned the appellant twice at 11:10 p.m. On August 27, 2008, Cody telephoned the appellant at 2:40 p.m., 3:49 p.m., 7:49 p.m., 9:11 p.m., and 9:57 p.m. The appellant telephoned Cody at 6:32 a.m., 1:08 p.m., 3:50 p.m., 6:37 p.m.,[4] and 9:57 p.m.[5] On August 28, 2008, Cody telephoned the appellant at 6:39 p.m. and 10:50 p.m. The appellant telephoned Cody at 3:49 p.m., 6:35 p.m., 10:22 p.m., 10:26 p.m., 10:43 p.m., and 10:51 p.m. On August 29, 2008, the day Cody was arrested, the appellant telephoned Cody at 3:06 a.m., 3:23 a.m., 3:54 a.m., 4:05 a.m., and 4:15 a.m.

Detective Filter also testified about telephone calls made between Churchwell and the appellant. On August 25, 2008, the appellant telephoned Churchwell at 1:41, p.m. 1:45 p.m., 3:53 p.m. 3:55 p.m., 5:29 p.m., 8:20 p.m., and 10:06 p.m. On August 26, the appellant telephoned Churchwell at 8:11 p.m., which was about one hour before the shootings, and at 10:12 p.m. On August 27, 2008, the appellant telephoned Churchwell at 2:06 p.m., 3:09 p.m., 3:42 p.m., 3:43 p.m., 6:44 p.m., 6:52 p.m., and 9:12 p.m. Churchwell telephoned the appellant at 3:46 p.m., 6:32 p.m., and 11:26 p.m. On August 28, 2008, the appellant telephoned Churchwell at 3:47 p.m., 6:42 p.m., and 6:43 p.m. Churchwell telephoned the appellant at 6:43 p.m. On August 29, 2008, the appellant telephoned Churchwell at 12:03 p.m., 12:22 p.m., 12:34 p.m., and 6:20 p.m. Churchwell telephoned the appellant at 12:20 p.m., 12:21 p.m., and 12:23 p.m. On August 30, 2008, the appellant telephoned Churchwell at 2:33 p.m., 3:33 p.m., and 7:06 p.m. On August 31, 2008, the appellant telephoned Churchwell at 3:03 p.m.

Detective Filter testified that on the day of the shootings, the appellant telephoned Cody about forty-five minutes before the shootings and about twenty-five minutes after the shootings. He said a person "very easily" could have walked from Pierre's house on McFerrin Avenue to the appellant's house on Carter Street within twenty-five minutes. The appellant's cellular telephone records for August 26, 2008, also showed that the appellant telephoned the La Quinta Inn, where Reed and Holloway were staying, at 11:07 p.m., about two hours after the shootings. About 3:30 a.m. on August 29, 2008, while police officers were looking for the suspects, the appellant telephoned Cody. About 4:15 a.m., police

---

[4]Detective Filter testified that Cody telephoned the appellant at 6:37 p.m. However, our review of the records shows that the appellant telephoned Cody at 6:37 p.m.

[5]Although not mentioned by Detective Filter, our review of the telephone records shows that the appellant also telephoned Cody at 12:06 p.m.

officers detained Cody at his home. Detective Filter said the appellant would have been able to see police cars at Cody's home from the appellant's home. The police arrested the appellant in February 2009.

On cross-examination, Detective Filter acknowledged that he did not know who made the telephone calls, who answered the telephone calls, or what was said during the calls. He also acknowledged that many of the calls were of short duration and that several of them occurred near the time of the shootings. He said that if the appellant placed calls to individuals near the time of the shootings, then the appellant was "[p]robably not" with the individuals at the time of the shootings. He acknowledged that the appellant's telephone records showed many other calls to many other individuals from August 25 to September 1, 2008.

Lawrence Baker, an inmate in the Criminal Justice Center (CJC), testified that he was convicted of aggravated assault in 2005 and recently pled guilty to a weapons charge that resulted in his receiving a ten-year federal prison sentence. At the time of the appellant's trial, Baker also was facing charges in Davidson County for aggravated robbery and evading arrest. He acknowledged that he had agreed to cooperate with the State in the appellant's case but said that the State had not promised him anything in exchange for his testimony.

Baker testified that in the fall of 2009, he was being housed in the CJC with the appellant, Reginald Adkins, Jessie Lobbins, and Maurice Boyd. In November 2009, Baker heard the appellant and Lobbins talking about "Maurice Boyd . . . jumping on [the appellant's] case and why something's got to happen to [Boyd]." Baker said that Boyd was cooperating with the police in the appellant's case and that he heard the appellant and Lobbins talking about Boyd at least two or three times. On the morning of November 21, 2009, the cell doors were opened about 7:00 or 8:00 a.m., allowing the inmates to interact with each other. Adkins came to Baker's cell and got Baker out of bed. Adkins and Baker walked to Boyd's cell, and Adkins and Boyd started fighting. Baker said that he grabbed Boyd and that Lobbins "[came] from my blind side." At first, Baker thought Lobbins had hit Boyd. Baker saw a lot of blood, and everyone ran out of Boyd's cell. Lobbins had cut and stabbed Boyd. After the attack, the appellant told Baker that he was going to put some money in Baker's commissary account, meaning the appellant was going to pay Baker for what had happened in Boyd's cell. Baker said the appellant conspired with Lobbins to stab Boyd.

On cross-examination, Baker acknowledged that he had been charged with conspiracy to commit first degree murder for his participation in the attack on Boyd. He said he did not know what information Boyd provided to the police, just that Boyd provided some information. He acknowledged that he participated in the attack on Boyd. Baker was holding Boyd when Lobbins cut Boyd's face, but Baker was not holding Boyd when Lobbins

cut Boyd's back. He acknowledged that the appellant was not in Boyd's cell at the time of the attack and that the appellant never gave him any money or put any money in his commissary account. He said that although the appellant did not participate in the "physical part" of attacking Boyd, the appellant talked about the attack three times. When asked if he was expecting leniency in return for his testimony, Baker said, "I'm not sure. I'm just doing what's right."

Gregory Chafos, an inmate in the CJC, acknowledged that he had prior felony convictions for robbery in 1979; receiving stolen property in 1988; felony drug possession in 1989, 1990, 1996, and 2002; theft in 2002 and 2003; and burglary in 2003. At the time of the appellant's trial, Baker also was facing charges in Davidson County for robbery and attempted robbery. He said that he was hoping for "some consideration" on those charges in exchange for his testimony but that he had not entered into an agreement with the State.

Chafos testified that in November 2009, he was the appellant's cellmate in the CJC. The appellant told Chafos that he and several co-defendants, one of whom was George Cody, had been charged with murder. Chafos said the appellant also told him that Maurice Boyd was "telling on [the appellant's] case." Chafos said that the appellant confronted Boyd and that Boyd told the appellant, "[Y]ou have nothing to worry about, I'm not telling on you." Chafos said that the appellant thought Boyd was "snitching" on one of the appellant's co-defendants and that the appellant said Boyd's snitching was "unacceptable." The appellant did not give Chafos any details about the crimes. However, Chafos said that one night, the appellant "mentioned something about credit cards . . . that they went to use some credit cards. And I said, so, in other words, after you gave them the credit cards and you told them what had happened, they still went and used them? And he said, yeah, like that."

On cross-examination, Chafos acknowledged that he was a career criminal. He said that he learned two or three days before the attack on Boyd that something was going to happen to Boyd. He said that he thought Boyd was "going to get beat down" and that he did not know Boyd was going to be stabbed. During the attack, the appellant was standing at the door to his cell. The appellant did go into Boyd's cell.

Dr. Amy McMaster, the Interim Chief Medical Examiner for Davidson County, testified as an expert in forensic pathology that she performed Pierre Colas's autopsy. The victim was five feet, nine inches tall and weighed one hundred fifty-six pounds. He had been shot in the head. The bullet entered the right side of the victim's head, traveled right to left, and traveled slightly downward. Dr. McMaster recovered the bullet from the victim's sinuses on the left side of his skull. No soot or stippling was around the wound, meaning either that the gun was more than a couple of feet away from the victim when it was fired or that something, such as a hat, was between the gun barrel and the victim when it was fired. Dr. McMaster said the bullet caused fatal injuries to the victim immediately or almost

immediately. She said that the victim would have been able to take breaths and that she found blood in his lungs, indicating he took a couple of breaths while he was dying. Dr. McMaster said that the cause of the victim's death was a gunshot wound to the head and that the manner of death was homicide.

The forensic pathologist who performed Marie Colas's autopsy did not testify at trial, but Dr. McMaster testified from the pathologist's report. Marie Colas was five feet, six-and-one-half inches tall and had been shot in the head. The bullet entered the left side of her head and partially exited the left side. A portion of the bullet and a portion of the bullet jacket were recovered. No soot or stippling was around the entrance wound. The victim was transported to Vanderbilt Hospital and was there for a couple of days. The gunshot caused her brain to swell, preventing the flow of blood to her brain. Dr. McMaster said that the cause of the victim's death was a gunshot wound to the head and that the manner of death was homicide.

The parties stipulated that the spent shell casing on the floor in Pierre Colas's home and that the projectiles removed from the victims' bodies were fired through the .380 pistol found at Cody's house. The State rested its case-in-chief.

Margaret McGatha testified for the appellant that she used to date the appellant and that he lived with her in August 2008. McGatha delivered newspapers seven days per week and got up every morning between 3:00 and 4:00 a.m. On the night of August 26, 2008, McGatha went to bed between 9:00 and 10:00 p.m. The appellant was in the back yard. McGatha woke about midnight, and the appellant was watching television in the living room. McGatha got up about 3:00 or 3:30 a.m., and the appellant went with her to deliver newspapers. He did not have any credit cards in his possession. On the morning of August 29, McGatha left home to deliver newspapers and saw the police at Cody's house. She said that after she delivered the papers, she and the appellant went to Cody's home "to see what was going on."

On cross-examination, McGatha acknowledged that she gave a statement to police on January 23, 2009, and that her memory then would have been better than it was at trial. She acknowledged that when the police asked her about August 26, 2008, she told them, "I don't know about that exact day. I couldn't tell you." She said that if the appellant left her home between 10:00 p.m. and midnight on August 26, 2008, she would not have known. She acknowledged that she told the police, "[W]ell, he told me he didn't do it." She also acknowledged that when the police asked her if the appellant was present during the shootings, she said, "[H]e didn't say all that. He just said he didn't do it." The State showed McGatha the appellant's cellular telephone records for August 26, 2008, and she acknowledged that they showed she called the appellant's cellular telephone at 9:49 p.m. McGatha said that the appellant may have lost his telephone and may have used her

telephone to call and find his telephone. She also said her children may have used her telephone to call the appellant because he was in the back yard.

The jury convicted the appellant as charged of two counts of first degree felony murder and two counts of especially aggravated robbery, a Class A felony. After a sentencing hearing, the trial court sentenced him to life for the murder convictions and fifteen years for the especially aggravated robbery convictions. The trial court ordered that the sentences be served concurrently.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant claims that the evidence is insufficient to support the convictions because no physical evidence links him to the shootings and because he did not participate in the use of the victims' credit cards. Moreover, the appellant contends that the State's reliance on his telephone records "is the purest of speculation that the calls were made by the Defendant or that the calls show the Defendant's connection to the crimes or proof of his guilt beyond a reasonable doubt." The State argues that the evidence "established multiple connections" between the appellant and the crimes. Specifically, the State argues that the appellant's living in close proximity to Pierre Colas's home and Cody's home, that the appellant's being with Cody when Cody picked up Reed and Holloway, that the appellant's lying to police about not having any contact with Cody before the crimes, that the appellant's telephoning the La Quinta Inn after the crimes, and that the appellant's "admission" to Gregory Chafos prove his guilt beyond a reasonable doubt.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

-12-

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting State v. Marable, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

In order to sustain the appellant's conviction for felony murder, the State was required to prove that the appellant killed the victims in the perpetration of or attempt to perpetrate a robbery. Tenn. Code Ann. § 39-13-202(a)(2). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). Especially aggravated robbery is robbery accomplished with a deadly weapon where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a)(1), (2).

"A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). In this case, the trial court instructed the jury on all three theories of criminal responsibility. Tennessee Code Annotated section 39-11-402(1) provides that an appellant is criminally responsible for an offense committed by another if "[a]cting with the culpability required for the offense, the [appellant] causes or aids an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense." Tennessee Code Annotated section 39-11-402(2) provides that an appellant also is criminally responsible for an offense committed by another if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the [appellant] solicits, directs, aids, or attempts to aid another person to commit the offense." Finally, Tennessee Code Annotated section 39-11-402(3) provides that an appellant is criminally responsible for the conduct of another if

> [h]aving a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the person fails to make a reasonable effort to prevent the commission of the offense.

Taken in the light most favorable to the State, the evidence shows that George Cody and the appellant lived in very close proximity to each other and the Colas home. About 9:15 p.m. on August 26, 2008, Cody entered the Colas house, robbed the victims, and shot them. Less than two hours after the shootings, the appellant telephoned the La Quinta Inn, where Thomas Reed and Michael Holloway were staying. Cody telephoned Reed and spoke with Holloway about using some credit cards. When Cody arrived at the La Quinta Inn to pick up Holloway and Reed, the appellant was with him. The four of them went to Cody's house, and the appellant and Cody talked privately for about ten minutes. Then the appellant left. In the early morning hours of August 29, 2008, the police arrested Cody at his home. The appellant telephoned Cody repeatedly and showed up at Cody's house, trying to find out what was happening. The appellant voluntarily spoke with the police on September 2 and denied having any contact with Cody prior to the shootings. However, the State introduced the appellant's cellular telephone records into evidence, showing that the appellant spoke with Cody on numerous occasions in the days and minutes before the shootings. He also spoke with the appellant after the shootings. However, the records showed that no telephone calls were made between Cody and the appellant during the time of the shootings. After the appellant's arrest, he learned Maurice Boyd was giving information to the police about the Colas case and conspired with several other jail inmates to kill Boyd. According to the appellant's cellmate, Gregory Chafos, the appellant acknowledged that he "gave them the credit cards and . . . told them what had happened." We determine that the combination of all the circumstantial evidence in this case, particularly the appellant's attempting to contact Reed and Holloway after the shootings, the appellant's accompanying Cody to pick up Reed and Holloway, the appellant's conspiring to silence Boyd, the appellant's lying to police about having contact no with Cody prior to the shootings, and his statements to Chafos about the crimes, is sufficient to support the inference that the appellant committed the crimes with Cody.

## B. 404(b) Evidence

The appellant contends that the trial court erred by allowing evidence that he conspired with Adkins, Baker, and Lobbins to kill Maurice Boyd. The State argues that the trial court properly admitted the evidence. We agree with the State.

Before trial, the State filed a notice of intent to use prior bad act evidence and requested a hearing pursuant to Rule 404(b), Tennessee Rules of Evidence. According to the notice of intent, in the summer of 2009, MNPD detectives interviewed Maurice Boyd, who had been Lavonta Churchwell's cellmate in the CJC. Boyd told the detectives about incriminating statements Churchwell made regarding his and the appellant's involvement in the Colas case. In November 2009, Boyd was attacked in his cell. As a result of the attack, the appellant, Jessie Lobbins, Reginald Adkins, and Lawrence Baker were charged with

conspiracy to commit first degree murder and attempted first degree murder. The State wanted Baker and Gregory Chafos, the appellant's cellmate, to testify at the appellant's trial about the appellant's involvement with Boyd's attack. The State argued that the appellant's attempt to suppress a potential State witness's testimony was relevant to his guilt in the Colas killings.

At the hearing, the defense argued that the trial court should exclude the testimony because Boyd was going to be a witness in co-defendant Churchwell's case, not the appellant's case, and because the State had failed to establish a conspiracy to kill Boyd. The defense also argued that the evidence was highly prejudicial.

In a written order, the trial court noted that a material issue existed regarding the identities of the perpetrators in this case. The court ruled that testimony about the appellant's involvement in the attack on Boyd was admissible because the jury could infer the appellant's guilt in the Colas killings from his attempt to suppress Boyd's testimony. The trial court, relying on State v. Maddox, 957 S.W.2d 547, 552 (Tenn. Crim. App. 1997), also stated that evidence in such situations "tends to outweigh the danger of unfair prejudice."

Tennessee Rule of Evidence 404(b) provides,

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if
its probative value is outweighed by the danger of
unfair prejudice.

See also State v. Thacker, 164 S.W.3d 208, 240 (Tenn. 2005); State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985). A trial court's decision regarding the admission of Rule 404(b) evidence will be reviewed under an abuse of discretion standard; however, "the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

Generally, "[o]nly in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident." State v. Luellen, 867 S.W.2d 736, 740 (Tenn. Crim. App. 1992). Moreover, this court has stated, "'Any attempt by an accused to conceal or destroy evidence, including an attempt to suppress the testimony of a witness, is relevant as a circumstance from which guilt of the accused may be inferred.'" Maddox, 957 S.W.2d at 552 (quoting Tillery v. State, 565 S.W.2d 509, 511 (Tenn. Crim. App. 1978)).

Turning to the instant case, the trial court did not specifically address whether it found proof of the other crime, wrong, or act to be clear and convincing. However, the trial court noted in its written order that "the Defendant also argues that no evidence of his involvement in the conspiracy exists." Therefore, we can infer from the trial court's allowing Baker and Chafos to testify that the court found evidence of the appellant's involvement in the conspiracy to kill Boyd to be clear and convincing.

We agree that the appellant's conspiring to attack Boyd was an attempt to stop Boyd from providing information about the Colas killings. Moreover, we agree with the trial court that the appellant's involvement in the conspiracy was relevant to his identity as one of the perpetrators in the Colas case and his guilt. Granted, the evidence was prejudicial. However, the jury knew Baker and Chafos were incarcerated felons, hoping to receive favorable treatment in pending cases in exchange for their testimony. Therefore, we are unable to conclude that the trial court abused its discretion by ruling that their testimony was admissible.

## C. Motion to Suppress

Finally, the appellant claims that the trial court erred by denying his motion to suppress the introduction of his cellular telephone records into evidence because the State

failed to comply with Tennessee Code Annotated section 40-17-123, the statute for obtaining a subpoena for the production of documents or information. The State claims that the trial court properly admitted the evidence. We agree with the State.

On September 2, 2008, Detective Ward sought to obtain a subpoena for the appellant's telephone records and prepared an affidavit in support of a request to compel the production of the records. In the affidavit, Detective Ward stated as follows:

> On August 26, 2008, at approximately 2117 hours, [officers] were dispatched to . . . McFerrin Ave. in reference to a shooting. Upon arrival, officers discovered that Pierre Colas and Marie Colas had both sustained gunshot wounds to the head. Pierre Colas was found dead at the scene and Marie Colas was transported to Vanderbilt Hospital. Marie Colas died from her injures at Vanderbilt Hospital on August 31, 2008. Through the course of the investigation, detectives developed several suspects as persons who were involved in this incident. On August 29, 2008, 4 suspects were taken into custody. Through interviews with the arrestees, it is believed that more suspects are involved in this incident. Furthermore, phone conversations between all of the suspects took place between the dates listed above. The above phone records are needed to assist in the identification and eventual apprehension of the suspects that have not been identified.

That same day, a judicial subpoena was issued to T-Mobile USA for all incoming and outgoing calls for a specific telephone number from August 25, 2008, to September 1, 2008. T-Mobile faxed the records to the MNPD on September 6, 2008. According to the records, the name on the billing account for the telephone number was Vanessa R. Thomas, the appellant's mother.

On January 16, 2009, Detective Filter sought to obtain a subpeona for additional telephone records and prepared an affidavit in support of a request to compel the production of the records. In the affidavit, Detective Filter briefly described the facts of the crime and stated that four suspects had been arrested on August 29, 2008. Detective Filter then alleged as follows:

> Through interviews with the arrestees, it is believed that more suspects are involved in this incident. Furthermore, phone conversations between all of the suspects took place between the

dates listed above as well as around the time of the incident. The above phone records are needed to assist in determining the exact involvement of the known suspects and possible involvement of other persons of interest.

That same day, a judicial subpoena was issued to T-Mobile USA for the call history and cell tower locations for the same telephone number from August 25, 2008, to September 1, 2008.

Before trial, the appellant filed a motion so suppress the telephone records obtained by the State because Tennessee Code Annotated section 40-17-123 "is designed for the production of documents to assist law enforcement officers in the investigation of crimes. The judicial subpoena power of this statute is not intended as a discovery device in pending cases." The appellant argued that because the records did not provide investigators with the actual telephone conversations, the identities of who made the calls, or the identities of who received the calls, the records were of little to no evidentiary value to investigators. The appellant also argued that he received no notice that the records were being subpoenaed, which violated his privilege against self-incrimination.

The trial court determined that the detectives, not the district attorneys general or their assistants, sought the subpoenas and that the detectives sought the subpoenas as part of their investigation into the crimes, not to obtain discovery. The court also determined that the affidavits used to obtain the subpoenas satisfied the requirements in Tennessee Code Annotated section 40-17-123(b). Regarding the appellant's due process and self-incrimination claims, the trial court found no merit to the issue because "the records sought in this matter are not self-incriminating in nature."

Tennessee Code Annotated section 40-17-123 describes the procedure to be used when a law enforcement officer seeks a subpoena "for the purpose of establishing, investigating or gathering evidence for the prosecution of a criminal offense." Tenn. Code Ann. § 40-17-123(a). According to the statute, the officer must prepare an affidavit, and the affidavit shall state "with particularity" the following:

(1) A statement that a specific criminal offense has been committed or is being committed and the nature of the criminal offense;

(2) The articulable reasons why the law enforcement officer believes the production of the documents requested will materially assist in the investigation of the specific offense committed or being committed;

(3) The custodian of the documents requested and the person, persons or corporation about whom the documents pertain;

(4) The specific documents requested to be included in the subpoena; and

(5) The nexus between the documents requested and the criminal offense committed or being committed.

Tenn. Code Ann. § 40-17-123(c).

After the affidavit is submitted to the trial court, the trial court must examine the affidavit and may examine the affiant under oath. Tenn. Code Ann. § 40-35-123(d)(1). The trial court shall grant the request for a subpoena if the court finds that the affiant presented a reasonable basis to believe the following:

(A) A specific criminal offense has been committed or is being committed;

(B) Production of the requested documents will materially assist law enforcement in the establishment or investigation of the offense;

(C) There exists a clear and logical nexus between the documents requested and that offense committed or being committed; and

(D) The scope of the request is not unreasonably broad or the documents unduly burdensome to produce.

Tenn. Code Ann. § 40-17-123(d)(1).

"The trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). However, the trial court's application of the law to the facts is a question of law that this court reviews de novo. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

The appellant argues that "since it cannot be said with any certainty who made the calls to whom, there is no nexus between the records and the crime committed." However,

-19-

during the appellant's interview with police, he told them that the telephone number at issue was his telephone number. Moreover, the trial court specifically addressed the fifth factor regarding a nexus between the documents requested and the criminal offense committed, stating, "It is clear that a nexus between the crimes and the requested information exists based on the coordination of suspects by evidence of communication shortly before the commission of the crimes and for a reasonable period thereafter." The statute required only that the affiant presented a "reasonable basis" to believe that a clear and logical nexus between the documents requested and the offense committed. It was reasonable to believe the suspects would have placed telephone calls to other potential suspects before and after the shootings. Therefore, we cannot say that the trial court abused its discretion by denying the appellant's motion to suppress.

The appellant also argues that his failing to receive notice of the subpoenas violated his right to assert his privilege against self-incrimination and, therefore, denied him due process. The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Similarly, article I, section 9 states that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Thus, a defendant cannot be compelled to give self-incriminating testimony without a grant of immunity. See Colley v. State, 169 S.W.2d 848, 849-50 (Tenn. 1943). Tennessee Code Annotated section 40-17-123(h) states,

> No person shall be excused from complying with a subpoena for the production of documentary evidence issued pursuant to this section on the ground that production of the requested materials may tend to incriminate the person. Any person claiming a privilege against self incrimination must assert the claim before the court issuing the subpoena and before the time designated for compliance therewith. If the district attorney general thereafter certifies to the court that the interests of justice demands the production of the requested materials for which the claim of privilege is asserted, then the court shall order the production of the materials and no individual shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning the requested materials the person was compelled to produce. If the person fails to assert the privilege against self-incrimination, the person may raise this issue later but will not be entitled to immunity from prosecution.

Initially, we note that nothing in Tennessee Code Annotated section 40-17-123 requires that the target of a subpoena issued to a third party be notified about the issuance of the subpoena, and the appellant has cited to no authority requiring notice. Moreover, the subpoenas in this case directed T-Mobile USA to produce documents relating to the appellant. They did not compel the appellant to give evidence against himself. Therefore, we find no merit to the appellant's claim that his failure to receive notice about the issuance of the subpoenas denied him the right to assert his privilege against self-incrimination.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE